6   130
112 593

---

No. 16.—Edward B. Young and John A. Calhoun, Intendant of the Town of Eufaula, Alabama, plaintiffs in error, *vs.* James Harrison and Samuel Harrison, administrators of William Oliver, deceased, defendants.

[1.] The right to receive toll for the transportation of travelers and others, across a river on a public highway is, at Common Law, a franchise of the Crown. In this State, it belongs to the people collectively.

[2.] The owner of land on the banks of a river, has not, as a matter of right, and merely because he is owner, the privilege of keeping a public ferry. His right to do so can only arise by grant, actual or implied.

[3.] The State has a right to erect bridges, whenever and wherever the Legislature may deem them necessary for the convenience of the public.

[4.] The right of eminent domain, by which the State is authorized to take private property for public use, when the necessities of the country require it, is an inherent right of this, as of every other government.

[5.] The State may construct public works, such as roads and bridges, by taxation, or the personal labor of its citizens, or through the instrumentality of individuals or corporations.

[6.] A bridge may be established and a keeper be appointed, without any regard to the ownership of the soil, should the Legislature so direct. The franchise or right to keep ferries and bridges, should, if practicable and consistent with the public welfare, be conferred on the owners of the soil, rather than on strangers.

[7.] Corporations may be dissolved for a breach of trust. A public corporation which exists only for public purposes, may be dissolved, modified, enlarged or restrained, at the will of the Legislature.

[8.] A private corporation is a contract between the government and the corporators; and the Legislature cannot repeal, impair or alter the rights

and privileges conferred by the charter, against the consent and without the default of the corporation, judicially ascertained and declared in a proceeding instituted by the government, directly for that purpose. A forfeiture for non-user or mis-user, must be by the judgment of a Court of Law, the Corporation being first called upon to answer. No advantage can be taken of any non-user or mis-user, on the part of the corporation, by any defendant in any collateral action.

In Equity, in Randolph Superior Court. Motion to dismiss the bill and dissolve the injunction, before Judge WARREN.

James Harrison and Samuel Harrison, as the administrators of William Oliver, deceased, filed their bill in Equity in the Superior Court of Randolph County, returnable to the October Term, 1848, in which they charged:

That in the year 1835, James Harrison and Wm. Oliver, then in life, purchased of K. McKenzie, fractions Nos. 350, 354, 355, 356 and 381, and lots Nos. 316 and 324, in the 8th district of said County, containing 1007 acres, more or less, for the sum of $25,410; and that deeds have been made to the complainants in the bill. That at the time of the purchase, there was a ferry on the land in operation, across the Chattahoochee, which was very valuable, and likely to become more so, being immediately opposite the City of Eufaula, in the State of Alabama.

That in the year 1837, the Legislature passed an Act " to incorporate the Irwinton Bridge Company," for the purpose of erecting a bridge across the Chattahoochee river, opposite the Town of Irwinton, (Eufaula,) commencing upon the lands of the complainants. By the terms of said Act, it was provided that the said Company might appropriate, for the erection of said bridge, the land necessary for the same; and in case of disagreement between themselves and the land-holder, with reference to the value of the land, " it shall be lawful for the Board of Directors to appoint one disinterested freeholder, and for the owner or owners to appoint another disinterested freeholder, as appraisers, and the Inferior Court of Randolph County to appoint another disinterested freeholder; but if such owner or owners shall decline to appoint an appraiser, then two appraisers shall be appointed by the Inferior Court;" their award " shall be taken as a judgment for the amount against the Corporation, and shall be enforced by an execution from the said Inferior Court."

The Act farther provided, that "the said Corporation shall commence the work in one year, and complete the same in three years from the passage of the Act."

The bill charged, that soon after the passage of the Act, the said Company did erect their bridge, without complying at all with the provisions of the Act; that at the February Term, 1841, of the Superior Court of said County, the complainants filed a bill praying an injunction against the said Company, and also a decree for the damage done by the erection of said bridge, and also, for the value of the land; that at the October Term, 1846, a final decree was rendered in favor of the complainants, for the sum of $1500, " for their damages sustained by reason of the trespass on their said premises," entered upon a verdict, generally, " for the sum of $1500, with costs of suit ;" which decree stands unpaid and unreversed.   That at the October Term, 1845, of said Court, the complainants commenced their action of ejectment against one Edward B. Young, for their said tract of land, the said Young claiming to be the assignee of the Company, and the sole owner of the bridge ; that at the October Term, 1846, a verdict was rendered in their favor, with the sum of $1683, mesne profits; that pending the appeal upon said action, said Young, at the April Term, 1847, filed his bill in said Court, charging that he was the assignee of all the rights and privileges of said Company; that the said Company had applied and obtained the appointment of appraisers ; that by some clerical mistake or otherwise, the order of the Court appears upon its face, to have been granted by the Inferior Court, sitting as a Court of Ordinary ; that though these proceedings were irregular, the Company had attempted to comply with the provisions of its charter in good faith; and prayed an injunction against the action of ejectment, and to compel the complainants to receive the compensation provided by the charter.   Upon a hearing before his Honor, *Judge Warren*, the injunction prayed for was refused ; which decision was excepted to, and upon a hearing before the Supreme Court, reversed, (3 *Kelly*, 31,) and the writ of injunction granted, so as to give the said Young "a reasonable time to comply with the provisions of the charter incorporating the Irwinton Bridge Company, in acquiring the title to the use and enjoyment of the land on which the eastern abutment of the Irwinton bridge is located ; when such compliance

Young and Calhoun *vs.* Harrison and Harrison.

is made, then said injunction to be dissolved, reserving to the defendants in the Equity cause, the right to prosecute their action of ejectment, for the recovery of the mesne profits only of their land, used, enjoyed and occupied by the said Company, from the time of such user and occupation by said Company or their assignee, up to the time the title of said Company or their assignee, shall be perfected, as required by the said Act of incorporation."

The bill farther charged, that said Young has had the full benefit of the *reasonable time* allowed him in the decision of the Supreme Court, within which to comply, some twelve months having expired since said decision, and that he has not yet complied with the requisitions of the charter, or procured the appointment of appraisers.

The bill farther charged, that some time in the year 184-, said bridge fell in near the western bank, and that ever since, the complainants have had their ferry in operation, having incurred considerable expense in the building of a flat, the purchase of rope, and the preparation of the road to and from the ferry, from which ferry they are receiving annually, a nett income of $1000.

That since the decision of the Supreme Court, the said Young has assigned all his interest in said bridge to the Town Council of Eufaula, Alabama; and that said Young, or said Council, or both, are about finishing the repairs of said bridge; and that their purpose and object is to re-build the same, and again trespass upon the lands of complainants, without complying with the decision of the Supreme Court, or the provisions of the charter; and that if let alone, as soon as the timbers can be put together, they will again appropriate to themselves the lands of the complainants.

The bill further charged, that said Irwinton Bridge Company has been dissolved, and is insolvent; that they could never recover anything out of the Town Council of Eufaula or Young, who is charged to be in failing circumstances; and that to sue for the daily trespass, would give rise to an endless multiplicity of suits.

The bill further charged, that at the January Term, 1848, of the Inferior Court of said County, application was made by Young, for the appointment of appraisers to assess the damages; that said Court decided that said Young did not show such title in himself as to authorize his application, and refused to appoint the appraisers; that said Young applied to Judge Warren for a

mandamus, to compel the said Court to appoint appraisers, and a mandamus nisi was granted; that said Court have filed their return, and that said mandamus is still pending in said Superior Court.

The bill prayed that said Young and Town Council should be enjoined from re-building said bridge or putting the same into use and employment, until they have complied with the provisions of the Act of incorporation within the time granted by the Supreme Court, and have paid the complainants for the use of their land and the injury to their ferry.

Edward B. Young, by his answer, admitted the title in complainants, or one of them; that at the time of the purchase, there was a ferry-landing on some part of said land, although he insisted it was there neither by grant or prescription, by which alone· it could be established, so as to enter as an element of value in said land; he admitted the charter of the Company and the erection of the bridge, insisting that said Company, *bona fide*, attempted to comply with the provisions of its charter. The answer urged that during the time the said bridge was being erected, no effort was made by the complainants to arrest its progress; it admitted the filing of the bill in 1841, and the decree thereon, and prayed that the same might be held as pleaded, as a judgment of former recovery. Young admitted the assignment by the Company to him, and insisted that the same was *bona fide*, and for a valuable consideration; he admitted the suit in ejectment, the injunction prayed by him, and the decision of the Supreme Court thereon.

He admitted that he had not procured the appointment of appraisers, but insisted that it was from no laches of his; on the contrary, that on application to the complainants, and failure to agree with them, and on their refusal to appoint an appraiser, he applied to the Inferior Court, in accordance with the decision of the Supreme Court; that complainants, by their counsel, appeared and objected to the same, and that said Inferior Court refused to appoint appraisers, on the ground that the deed from the Irwinton Bridge Company to said Young, was not sufficiently proved.

The answer farther stated, that on their refusal to appoint the appraisers, said Young applied to and procured from the Judge of the Superior Court, a mandamus nisi, directed to said Infe-

rior Court, requiring them to proceed to appoint the appraisers, or show cause why a mandamus absolute should not issue; that at the next term of said Court, the Inferior Court failed to make any return until the close of the Court, when they filed an unsatisfactory and insufficient answer, too late to be excepted to; and that said mandamus stands continued, and remains undecided.

The answer farther admits, that in the year 1847, a portion of said bridge fell in, and that complainants did put their ferry again in operation, to which said Young insists they had no right whatever. He admits the profits from the same are large.

The answer further admits, that since the decision of the Supreme Court, he has made an arrangement with the Council of Eufaula, by which they engaged to make the necessary repairs, and at the end of the litigation, if it ever should end, they agree to pay him for the bridge, the sum of $4000.

The answer states, that more than twelve months before the filing of said bill, the said Council proceeded to repair said bridge, within the knowledge of said complainants, " and that said repairs had been prosecuted within a very few days of completion, when the said complainants interposed their present injunction," " thus making this valuable and expensive public improvement (cost about $30,000) valueless to the complainants, the defendant and the public." The answer " admits that it was and has been the object and purpose of himself and the City authorities of Eufaula, to rebuild said bridge, and to use it, but denies any intention to trespass upon the lands of complainants;" and " admits, that if let alone, as charged by the complainants, the timbers of said bridge would have been put together, and the bridge appropriated to the use of the public for the usual tolls; and says, that the putting of the timbers together, " at a point near the middle of the Chattahoochee river, was about all that remained to be done," when the bill was filed.

The answer admits the insolvency of the Irwinton Bridge Company, but denies the insolvency of the Town Council of Eufaula. The answer admits the embarrassed circumstances of the defendant Young, but urges that ample security was given by him on the appeal in the action of ejectment, and on the injunction bond, given on his application for the injunction to said action of ejectment. The Irwinton Bridge Company, it was admitted, had ceased to elect officers or use its charter in any way.

The answer farther sets out at length, certain equitable propo-sitions made by the defendant Young, to the complainants, for the opening of the bridge and securing the tolls, to be paid to whomsoever should hereafter be determined to be entitled to them.

The defendant insisted that he was not *about to take* land, which he had been in possession of since 1839, and urged many facts to show that the whole object of the complainants had been to vex, harrass and defeat the defendant in the execution of his lawful undertaking ; and that there was no equitable circumstance in the facts or the acts of complainants, to entitle them to this in-junction.    The answer of John A. Calhoun, Intendant of the Town of Eufaula, denied all knowledge of the various matters in controversy—admitted the contract between the Town Council and Young, as set out in Young's answer, and denied any inten-tion to interfere with the legal rights of complainants.

Defendants, by their counsel, demurred to the bill for want of equity; and upon filing the answers, moved to dissolve the in-junction, or so to modify it as to allow the public the use of the bridge.

The Court below overruled the demurrer and the motion to dissolve the injunction, which decisions are now alleged to be er-roneous.

H. HOLT, for plaintiff in error, submitted a brief, relying upon the following positions, among others :

1st. The bill contains no grounds for equitable interference, the remedy at Law being ample.

2d. That the ferry-landing is, in no sense of the term, property.

3d. That it is upon a *navigable stream,* the right and title to which remains in the State, and did not pass, by grant, to the land situate on its banks.

4th. That the bill shows the ferry to exist, without grant, pre-scription or license of any kind ; and if it did exist by grant, the Legislature had the right to authorize the construction of the bridge, which, if it injures the proprietors of the ferry, is " *Dam-num absque injuria.*"

5th. That the complainants are entitled to no relief, while they have a *subsisting judgment unreversed,* for the damages they have sustained by the building of the bridge.

6th. That a party cannot proceed, both at Law and in Equity, for the same cause of action, and at the same time.

7th. That the plaintiffs in error having been in possession since 1839, all claim of the complainants is barred by the lapse of time, the complainants having failed to make objection until large sums of money were expended, the bridge erected, and tolls actually received.

8th. That the plaintiff in error, if he has failed to comply with the provisions of the charter, has nevertheless acted in good faith, and has been hindered and delayed at every step, by the complainants below.

9th. That the Irwinton Bridge is a public work, and the use of such an one will never be enjoined.

10th. Cross injunctions, operating to the waste and destruction of property, are never favored and will never be allowed.

11th. Injunctions are never favored, to the prejudice of the public, or even of individuals, especially after large expenditure of money.

In support of these positions, he cited and commented on the following authorities :

*Prince's Dig. title, Roads, Bridges and Ferries,* 733 *to* 742. *Ib. title, Chattahoochee River,* 720, '3, '6, '7, '9. 8 *Cow. Lansing vs. Smith et al. Sup. Ct.* 146. 4 *Wendell, Same Case, Ct. of Er.* 9. 6 *Cowen, ex parte Jennings, Sup. Ct. N. Y.* 518. 5 *Wend. Same Case, Ct. of Er.* 423. 7 *Cow. Vanderbilt vs. Adams,* 349. 2 *Pet. Wilson et al. vs. Black Bird Marsh Co.* 245. 20 *John. R. Hooker vs. Cummins,* 90. 20 *John. R. Bradshaw vs. Rogers,* 103, 735. 3 *Caines' R. Palmer et al. vs. Mulligan et al.* 307. 14 *Ser. & R. Shunck vs. Schuylkill Nav. Co.* 71. 14 *Wend. Bloodgood vs. Mohawk and Hudson Rail Road Co.* 51. 9 *John. R. Livingston and Fulton vs. Van Ingree et al.* 507. 3 *Paige's Ch. R. Beekman vs. Saratoga & Sch. R. Co.* 45. 5 *John. Ch. R. Newburgh & Cocheton Turnpike Road vs. Miller et al.* 101. 2 *Stewart's R. Gates vs. McDaniel et al.* 211. 2 *Porter's R. Dyer vs. Tuscaloosa Bridge Co.* 296. *Charles River Bridge vs. Warren Bridge,* 6 *Pick.* 376. 7 *Ib.* 344. 11 *Pet.* 420. 10 *Ala. R. N. S. May. & Council of City of Columbus vs. Rogers et al.* 37. 1 *John. Ch. R. Hoffman vs. Livingston,* 211. 1 *Story's Eq. Jur.* §94, 109, 120, 388. 2 *Ib.* §885, 889. 4 *Wend. Wheelock vs. Young et al.*

647. *Eden on Injun.* 112, 113. *Drury on Injun.* 190, 260. 18 *Vesey, Birmingham Canal Co. vs. Lloyd,* 515. 13 *Ib. Gray vs. Duke of Northumberland,* 236. 7 *John. Ch. Jerome vs. Ross,* 315.

JONES, BENNING & JONES, for defendants.

H. L. BENNING submitted, among other points:

1st. Every riparian proprietor above the ebb and flow of tide water, is entitled to the land covered by the water, to the middle thread of the river. 3 *Peters' Dig.* 482. 3 *Kent,* 411, '12, '17, '27, '8, '9, 432, '3, '4, '7. 4 *Ga. R.* 255, '6, '7, 265. On the Chattahoochee this extends to the boundary of the State, " on" the western Bank. *Prince,* 151, 906.

2d. " Young's" entry was a trespass, and is not protected by the former judgment, for that was for damages for " injuries," and the Company is insolvent and the recovery unpaid. 3 *Kelly,* 40, 45.

3d. He has no title from the State, because the provisions of the charter were not complied with ; and in 1844, the Irwinton Bridge Company, by a voluntary dissolution, lost its ability to comply ; and in 1847, it was dissolved by Act of Legislature. *Pam.* 265. 3 *Kelly,* 39.

4th. The Legislature had the right to pass this Act, and re-absorb this franchise ; and if compensation is to be made, the State must make it. 3 *Kelly,* 39, 40.

5th. The conditions of the charter not having been complied with, the Legislature had the power to repeal it.

6th. It was not necessary that this failure to comply should have been judicially ascertained ; and if necessary, it had been in fact ascertained. 2 *Kelly,* 143. 3 *Kelly,* 40, 46.

7th. The deed to Young was made before the Company acquired the interest they purported to convey. *Pam.* 1837, *p.* 141. 1 *Kelly,* 524.

8th. The plaintiff in error has not availed himself of the *reasonable time* allowed by the decision of this Court, to comply with the provisions of the charter. The action of the Inferior Court is no excuse—

First. Because that decision was right ; and,

Second. If wrong, the time has expired within which it

might be corrected, and *mandamus* is not the proper writ by which to correct it.

9th. Young's entry being then a trespass, an injunction was the rightful remedy, because it was impossible to tell how many persons would cross at a ferry, and so to measure the loss which, when ascertained, could not be recovered of parties insolvent and beyond the jurisdiction of the Court.   1 *Kelly*, 10, 11.   2 *Story's Eq.* §959 *b*.   *Prince*, 447.   *Hotch.* 681.   *Beall vs. Fox's Adm'rs*, 4 *Ga. R.* 404.

*By the Court.*—LUMPKIN, J. delivering the opinion.      .

The complainants in the bill charge that they, for a long time, have been, and now are, the proprietors of a ferry across, the Chattahoochee river ; that the defendants, under and by virtue of an Act of incorporation, granted by the Legislature of this State, in 1837, are about completing a toll bridge across the said river, near their ferry, which, if finished and put in operation, will very materially injure, if not entirely destroy, the value of their ferry. They further state, that they are the owners of the land on the east or Georgia side of the river, upon which the defendants have placed one of the abutments of their bridge.   They further contend, that the Act of the Legislature is an unauthorized violation of their private rights ; that the same has been repealed by that body, and they pray an injunction against the defendants, prohibiting them from finishing said bridge, and from the use and enjoyment thereof, and also restraining them from trespassing on their land.

The injunction was granted by the Chancellor.   To this bill the defendants filed their answer, wherein they rely upon their grant from the State to erect this bridge, upon the building and repairs of which they have already expended about $30,000. They further show, that they have used due diligence in endeavoring, in good faith, to comply with the conditions of their charter, which they allege they have hitherto been prevented from doing, by the obstinate refusal of the complainants to accept compensation for the use of their property, and the failure of the Inferior Court of Randolph County, where the land is situated, to appoint commissioners to assess the damages due for the land of complainants, used in the construction of the bridge, as provided

for by the Act.    They state also, that a *mandamus* is now pend-
ing, to compel the Court to appoint appraisers ;  wherefore, they
ask that the injunction may be dissolved, and  they permitted to
complete the repairs necessary to the  opening of the bridge for
the public use.

Upon a motion made for that purpose, the Court below refused
to dissolve the injunction ; and to this decree this writ of error is
prosecuted.

I need hardly remark, that this cause involves principles of im-
mense magnitude in its results, both as it regards the interests of
individuals and the rights of the public.    I have not pretended to
recapitulate all the facts presented by the record, nor shall I at-
tempt to discuss, in detail, the numerous  questions involved in
this litigation.    Mine shall be the task of performing, as best I
may, the less ambitious, though perhaps not less acceptable
service of discussing a few of the more prominent features of this
case.    Our judgment upon these, must have a controlling influ-
ence upon the rights of the parties, as well as the means of re-
dress allowed them by law.

1st.  What, then, are the rights of the Messrs. Harrisons in the
ferry, which it is alleged, have been infringed by the charter
granted to the Irwinton Bridge Company ?    They set up none in
their bill, by grant from the State or otherwise.    It is claimed by
counsel in the argument, as an incident to their ownership of
the land on this Bank of the Chattahoochee river, and for which
they hold a deed of conveyance from  the State.    It is insisted,
that inasmuch as they purchased from the State, they had a right
to believe that this privilege was appurtenant to their deed, and
that they would be protected without molestation or disturbance,
in its enjoyment ; that it is inseparable from their title to the
property ; or, to state the proposition with more  technical pre-
cision, and with  greater  force for the  complainants, that inas-
much as the sovereign, as the owner  of the land, possesses the
power of transporting persons, his grant in such cases will com-
municate the whole franchise.    They insist, moreover, that it is
the height of injustice and tyranny, for the Legislature to pass an
Act in direct opposition to their own deed, and which so depre-
ciates the value of their ferry, that it is not worth continuing.

Are these claims well founded ?    It is not necessary to go ex-
tensively into the doctrine of riparian rights.    Rivers are of three

kinds : 1st. Such as are wholly and absolutely private property. 2d. Such as are private property, subject to the servitude of the public interest, by a passage upon them.   The distinguishing test between these two is, whether they are susceptible or not of use for a common passage.   3d. Rivers where the tide ebbs and flows, which are called arms of the sea.   *People vs. Platt*, 17 *Johns.* 211.   *Hooker vs. Cummins*, 20 *Johns.* 90.   4 *Burr*, 2164, *per Ld. Mansfield.*   It is not pretended that the Chattahoochee is at this point a navigable river, where the tide ebbs and flows; such is notoriously not the fact; it belongs to the second·class or division in the foregoing enumeration.   Now, it is well settled in England, and the doctrine is pretty uniform in this country, that the proprietor of the land on the margin, owns the bed over which the river passes; and though it be nominally and in terms, bounded on the margin, it extends, by construction of law, to the middle of the stream.   In this case, it reaches to the opposite bank, that being the western boundary of the State.   The public right is one of passage, and nothing more, as in a common high-way; it is called in the books an *easement*, and the proprietor of the adjoining land has the right to use the land and water of the river, in any way not inconsistent with this easement.

[1.] Has the riparian proprietor the right of ferry?   This point is thus clearly stated by *Sir Matthew Hale*, in his treatise *De Jure Maris* : " The King, by ancient right of prerogative, hath had a certain interest in many fresh rivers, even where the sea doth not flow or re-flow, as well as in the salt or arms of the sea; and these are those which follow : 1st. A right of *franchise* or *privilege*, that no man may set up a common ferry, for all passengers, without a prescription, time out of mind, or a charter from the King.   He *(the owner)* may make a ferry for his own use, or the use of his family, but not for the common use of all the King's subjects, passing that way; because it doth in consequence tend to a common charge, and is become a thing of public interest or use, and every man, for his passage, pays a toll which is a common charge, and every ferry ought to be under a public regulation; that is, that it give attendance at due time, keep a boat in due order and take but reasonable toll; for if he *(the ferryman)* fail in these, he is finable.   Hence it is, that if a common bridge be broken, whereby there is no passage, but by a boat or ferry, it hath been anciently practised in the Exchequer, to compel that

ferryman that ferries over people for profit, without charter from the King, or a lawful prescription, to account for the benefit above, his reasonable pains and charge."

I need not repeat here the extravagant eulogium pronounced by Mr. Wirt, on this great Judge, on the trial of Burr: that, "with a mind beaming with the effulgence of noonday, he sat on the bench, like a descended god!" But I will say, what is well known to jurists, that in England, this work, from which the above principle is extracted, is considered as conclusive upon any question relating to the rights of Sovereign or subject, either in the sea, arms of the sea, or public or private streams of water; and that its authority has been repeatedly recognized in this country. 2 N. H. R. 369, 371. 1 Randolph, 417, 420. 1 Halsted, 1, 74. 2 Conn. R. N. S. 481, '3, '4. 3 Cain. R. 307, 315, 318.

This, then, is the Common Law principle, and it is obligatory upon us, unless contrary to the constitution, laws or form of government established in this State.

Before proceeding to the examination of our own legislation respecting ferries, it may be well to advert, for a moment, to the views entertained by some of our sister States upon this subject.

In Lansing vs. Smith, (4 Wend. 21,) Chancellor Walworth, as the mouth-piece of the Court of Errors of New York, held this language: "So long as the constituted authorities of the State did not think proper to interfere, persons navigating the river might come to the wharf, subject to the payment of such wharfage as the State allowed the owner to take. But even the taking of a common wharfage or toll at a ferry, is a franchise subject to the control and regulation of the Legislature, and cannot be lawfully exercised without their permission." Citing, Hale, De Jure Maris, Morgan's Case, de portibus Maris, 51. 4 Com. Dig. tit. Piscary, B. Vanderbilt vs. Adams, 7 Cowen, 349. Wilson vs. The Black Bird Creek Marsh Co. 2 Peters, 245.

In Allen vs. Farnsworth, (5 Yerg. 190,) the Supreme Court of Tennessee say: "There is no doubt but that the State has the right to establish ferries, whenever the Legislature may deem them necessary for the easement of its citizens. This right of eminent domain, by which the State is authorized to take private property for public use, whenever the necessity of the country requires it, is necessarily inherent in every government. It would follow, from the existence of this right, that a ferry might be es-

tablished, and a keeper, who is a servant of the public, might be appointed, without any regard to his ownership of the land, should the Legislature so direct."

In *Dyer vs. The Tuscaloosa Bridge Co.* (2 *Porter*, 296,) the Supreme Court of Alabama went far beyond the doctrine contended for by counsel for the defendants below, and maintained that the keeper of a ferry opposite a town, *under license from the County Court, keeps it subject to the public convenience ; and the erection of a toll bridge near such ferry, by a Company, under charter from the Legislature, is not a violation of the vested rights of such ferryman* ; and that the principle that private property cannot be subjected to public use, without adequate compensation, does not apply to alleged losses sustained by the owner of the ferry, over a public water course opposite a town, *and who holds the same under grant from the County Court,* by reason of the erection near it of a toll bridge, under a charter granted by the Legislature.

*Mr. Justice Hitchcock,* in delivering the opinion of the Court, said: " The Court has not, in the view which it takes of complainant's rights in this case, found anything in the law complained of, which authorizes its interference. The laying off, regulating and keeping in repair, roads, highways, bridges and ferries, for the public use and convenience of the citizens, is an exercise of the supreme authority of the State, coeval with the institution of civil society, and indispensible to the free exercise of social and commercial intercourse; and as soon as men cease to roam abroad as savages, and lands become appropriated to private use, the reservation for public accommodation, of a sufficiency for these purposes, is necessarily implied, and the mode of regulating its use, is necessarily vested in the State. It is a part of the eminent domain, and as such, is treated by all writers on public law." Citing, *Vattel, liber* 1, *ch.* 20, §249. *Bynkershock, lib.* 2, *ch.* 15. *Domat, lib.* 1, *tit.* 8, §1. He adds: " It is upon this principle that roads are laid out, and that the citizens are compelled to contribute, either in money or labor, to keep them in repair."

So much for the adjudication of other Courts, respecting this franchise. We will now advert to our own legislation; and it will be found that the people, through the General Assembly, have always claimed the right to control the exercise of this privilege.

The Legislature, in 1805, passed an Act authorizing the Inferior Courts in each County within this State, to establish ferries and bridges, and such rates for crossing thereat, as to them should seem reasonable ; *retaining nevertheless, the power, at all times, of making such alterations in the establishments made by the Justices of the Inferior Courts, as to them may seem proper. Prince,* 734.

The decisions show that they have this right, without this reservation; that the grant of a ferry over a public water-course, is a license merely for the convenience of the community, and not such a contract as cannot be interfered with; that whenever the public require greater facilities, they should be afforded; and that if the profits of former establishments are thereby lessened, they have no legal cause of complaint.

And if this be true, how much more have they the power, when it has been expressly retained by Statute? Even had the Harrisons started this ferry under authority of law, and they claim none such, still they would have exercised the privilege, subject to the general law, and must abide the consequences. Surely, by erecting a *pourpresture*, in the old language of the law, attempting to make that private which ought to be public, they cannot relieve themselves from the reservation in the Statute, to which they would have been amenable had they proceeded lawfully.

In 1818, the same law was re-enacted in substance, with the additional provision, that wherever a ferry was established, it was made the duty of the Inferior Court, to cause every ferry owner to give bond and sufficient security, in such sum as they may think proper, conditioned for their keeping in repair, a good and sufficient flat, and attendance. *Prince,* 740.

To prove conclusively that the people, collectively, have retained this prerogative, and claimed, at all times, to control its exercise in the hands of the citizen, the Legislature, in 1820, passed a law to regulate the toll on Jersey wagons, in certain cases, throughout the State. *Prince,* 741. And again, in 1825, considering ferrymen as public servants, they exempted them, by law, from performing militia duty in time of peace. *Ib.* 741.

The right, then, to receive compensation from travelers and others, for their transportation across a river, on a public highway is, both at Common Law and by Statute, a public franchise ; and from its nature it ought so to be ; for no greater evil could well be imagined than the unrestrained power, on the part of in-

dividuals, to exact from the traveler, who cannot brook delay, nor stipulate for terms, whatever cupidity might exact.

[2.] Our conclusion, therefore, is, that upon the ground of individual right, and without grant from the public, the complainants had no vested right to keep a ferry or transport persons or effects for pay over the Chattahoochee river ; and that even had this ferry been established by authority of law, unless it was founded on valuable consideration, and necessarily exclusive in its nature, the individual right in this, as in all similar cases, would be held subject to the supreme and paramount right of the community.

Before dismissing this subject, I avail myself gladly of the occasion, to return my sincere thanks to the able counsel for the plaintiff in error, for the very thorough and satisfactory argument which he submitted upon this branch of the case.

[3.] 2d. It is contended that the Legislature have not only wrongfully destroyed the value of complainants' ferry, but that they have also wrongfully authorized the taking of their land for the eastern abutment of the bridge.

By the 6th section of the Act of Incorporation, it is provided, " That the Board of Directors shall have power to select and take, or receive as a donation, such parcel or parcels of lands as they may deem necessary for the construction, convenience. and protection of the said bridge and its abutments, piers, pillars or any thing in any wise belonging to or necessarily connected with the construction and protection of the said bridge ; and in case of disagreement between the owner or owners of said land, and the said Board of Directors, in regard to the damages or price of any part of such land, it may and shall be lawful for such Board of Directors to appoint one disinterested freeholder, and for the owner or owners to appoint another disinterested freeholder, as appraisers, and the Justices of the Inferior Court of Randolph County, shall appoint another disinterested freeholder; but if such owner or owners shall decline to appoint an appraiser, then two appraisers shall be appointed by the said Inferior Court ; all of whom shall be sworn by an officer authorized to administer an oath, to make and return to said Court a just and impartial valuation of the damages or value of the land thus required by the said corporation, and their *demand,* (meaning, I apprehend, *award,*) shall be in writing and signed at least by a majority of

said appraisers, which shall be held and taken as a judgment for the amount against the said corporation, and shall be enforced by an execution from the said Inferior Court; and the plat of the said land, with the award, shall be recorded in the said County of Randolph, in the same manner that deeds are, and shall vest the right of the fee simple to the said piece or parcel of land in the said corporation, so soon as the valuation thereof shall be made as aforesaid, and paid for, or when the money may have been tendered and refused : *Provided,* if either party shall think proper, he, she or they may appeal to the Superior Court of said County, and have the damages ascertained by the verdict of a Special Jury, and their decision shall be final." *Laws of Georgia,* 1837, *p.* 141.

[4.] It is conceded that by the Common Law, as well as by the Constitution of the United States, private property cannot be taken for public use, without just compensation. We see nothing in this Act which conflicts with this principle. Here, as much ground as may be necessary for the bridge, is condemned and authorized to be seized for that purpose ; but before it can be taken and permanently appropriated, a Jury, if demanded, are to assess the damages, which must be paid before the ground can be used.

We might content ourselves here, by suggesting that when this Court was organized, the question, as to the power of the Legislature to condemn so much land as was necessary for the construction of bridges, ferries, canals, rail roads and other public highways, by making or tendering adequate compensation to the party aggrieved, was no longer open ; it was *res adjudicata* all over the civilized world; it was settled by the Courts of Great Britain, of the Federal and State Governments throughout the American Union, and irreversibly fixed by four or five hundred miles of rail road spanning our State in every direction, and conferring incalculable benefits upon our people.

But I am not willing to ensconce myself behind my predecessors, the pioneer generation in these great enterprizes.

To listen to the fervid and impassioned eloquence of counsel, one would conclude, that instead of its being a legitimate exercise of power, it was a gross and palpable usurpation by the Courts and the Legislature ; one too, calculated to rob the people of their liberties, to plunder their property, to break down all

the barriers around their rights ; in short, to make them vassals to power and slaves to wealth !

It would seem to be strange and unaccountable, that a despotism so desolating, a power so monstrous. and revolting, should not have encountered a more formidable opposition.   The people must be miserably tame or stupid, or else (what we suspect to be true,) this picture is overwrought, too highly colored.   Any other conclusion would be a libel on the past history and patriotism of the country.

No one, I believe, denies to the State the right to construct a public road any where and in any way that it may think proper. It has been exercised repeatedly and time immemorially, and without complaint.   This, at least, is one of the cases, I believe, where all agree that individual right must yield to the public good.   It is decided in 2 *Bay's S. C. R.* 38, that the Legislature of the country is vested with the power to pass laws for laying off roads and highways in any part of the State, and to appoint commissioners to see them kept in repair, whenever they may think convenient and proper, *without any compensation to the owners of the land through which they run.*   This, the Court say, is a part of the *lex terræ*, a condition attached to all freeholders, and which existed before *Magna Charta.*

And it seems to have been overlooked, that we have a law in Georgia, passed 50 years since, and universally acquiesced in, and which asserts the identical principle which is now so strenuously resisted, viz : that although a citizen may hold a grant in his pocket to his land, yet a public road may be laid out through it, and if the owner feels aggrieved, he shall submit to the arbitrament and award of a Jury of his country, the question of injury. *Prince, 1st ed. p.* 399.   Every public highway and bridge in the State has been constructed, and for thirty-five years from 1799, to the date of the Act, incorporating the first rail road without complaint, upon this principle.

[5.] Shall it be said that these were public roads, and laid out for the general welfare ?   I ask, who is to be the judge of what is or is not for the public use, but the people themselves, speaking through their representatives, simply because it is inconvenient, if not impracticable, for them to assemble in mass and decide these matters ?   To make a thing of public use, it need not, I apprehend, be used as a public common ; nor must it be in the

continued occupancy of the agents of the Government. Suppose all Georgia were congregated together, and it should be determined that the public good made it expedient and highly advantageous, to erect every public work which now exists, and which gives us such a proud pre-eminence among our Southern sisters, who doubts the power of the people to construct these rail roads, canals and bridges, and to seize and appropriate private property for that purpose, allowing to the owner, if his injury exceeded his share of the common advantage, to be compensated by a Jury? If the State could do this directly, what is there to prevent it being done by contract? Would it be constitutional to call out the people, with their slaves, axes, mattocks and shovels, to build a rail road, or to tax them, as has been done in this State and every other, at the rate of $15,000 to $20,000 a mile for that object, and take and appropriate the citizens' land for its use? If so, why is it unconstitutional to grant a charter to a Company to have this done at such an immense saving of burdens, personal and pecuniary? Suppose it were submitted to a popular vote, to determine whether our Western & Atlantic Rail Road, now in a course of completion, should have been built by a private Company, charging moderate fare and freights, as were the Georgia, Central, and Macon & Western Rail Roads, or by taxes or personal labor? Would they hesitate to choose the corporation system? To doubt it, would be a gross reflection upon their intelligence.

If the people may lawfully exercise the right, they may transfer it. A few years since, our people were taxed to buy negroes to work on the public roads, and agents were employed and paid to superintend them. Nobody questioned this exercise of power. The community are entitled to the best roads. If it is cheaper to get others to construct them, than to do it themselves, where is the mischief? It is only employing the best instrumentality, for accomplishing the great system of internal improvement demanded by the age, and still more by the inexhaustible resources teeming in every portion of our State, and which need only the proper encouragement for their development; resources, in comparison with which, all the gold of California is but dross; and which lay buried in the bowels of the earth, or rotting on its surface for half a century, for want of the necessary facilities to make them available!

Civilization must advance ; the improvements of society, diffusing plenty and prosperity, knowledge and refinement and morality all around, must not, cannot be restrained ; public opinion has willed it, decreed it, and there is no higher power to which to appeal—*Vox populi, vox Dei.*

I cannot forego the pleasure of transcribing here, the eloquent and appropriate remarks of the late *Chief Justice Lipscomb,* upon this subject : "Within the last three or four years, numerous charters, containing provisions for condemning private property, have been granted to Rail Road and Canal Companies ; and although it is not contended that error sanctions error, we should be well convinced that those States have erred, before we are at liberty to discard the force of the argument, deduced from the fact, that such power has been exercised by those intelligent and patriotic Legislative bodies, and that this power has never been judicially impugned.  Reference to the time when these charters were granted, gives additional weight to the argument; for if there ever was a time when the powers of Government were diligently and critically investigated, it is the period of the enactment of those charters.  It is a truth that will not be controverted, that the whole history of the past ages, presents no period of time when the powers of Government have been subjected to as jealous and severe scrutiny, as the age in which we live.  The people know and justly appreciate, not only their rights, but their own power, and they are too vigilant to permit them to be abridged by their rulers.  Virginia, the mother of Washington, Henry, Pendleton, Wythe and Jefferson, and a host of other departed apostles of liberty, over whose names and memory, 'time shall achieve no conquest'—Virginia, always on the watchtower and ready to cry aloud and give the alarm, at the slightest encroachment on personal liberty and private right—she, too, has, within the last two years, (1832,) granted several charters to Rail Road Companies, containing precisely the same provisions.  And is Alabama alone to be arrested from indulging the public spirit of her citizens, and marching hand in hand with her sister States, in the great work of internal improvement, by a conscientious jealousy of Federal interference, on the one hand, and an inability to give efficiency to the efforts of public-spirited individuals in the cause, on the other ?  The grant to the corporation was intended to be a public benefit.  The prosperity of the stockholders is insepara-

ble from that of the community. By adding to the convenience, wealth and general prosperity of the people alone, can the stock be made profitable. It only remains for me to inquire, if a sufficient provision has been made to secure to the owner a just compensation for his property, to be ascertained according to the due course of law." 2 *Stewart's R.* 213.

When this case was up before, the Court admitted that the Company had the right to enter upon the land of the complainants, and to make the necessary surveys, and to take all other preliminary steps for locating the eastern abutment of the bridge; but denied to them the right to appropriate the private property of the complainants to their permanent and exclusive use, until just compensation had been made or tendered, in terms of the charter. 3 *Kelly*, 45. The same doctrine is re-affirmed in *Morris vs. the Macon and Western R. R. Co. Ib.* 338. We are not disposed to go now beyond this. Where property is appropriated by the Government in time of war, for provisioning armies, supplying the means of transportation, destroying all the means of subsistence to arrest the progress of an invading foe; in these and all other cases of like necessity, private property is subjected to the public use, before compensation is or can be made. To require this as a condition precedent would render the right itself nugatory. Indeed, where the State is the debtor of the citizen, the public faith is the only guarantee which the owner needs or can ask. Nor can the Courts presume any thing to the contrary. But when the equivalent is to be made by a private person or corporation, compensation should be made or tendered before the party will be allowed to take exclusive occupancy of the property.

In this case, that has not been done, although, as we feel warranted from the evidence disclosed in the record before us, it has been attempted in good faith. We cannot, therefore, direct the injunction to be dissolved. We will, however, under the facts and circumstances, grant further time to enable the Company to comply with their charter, and in the meanwhile pass such order as will protect the property from decay, and give to the public the use and enjoyment, leaving the fund arising from the tolls, in the hands of the Chancellor, to be paid over to the rightful owner, whenever the conditions of the charter are performed.

3d. It is contended that the Irwinton Bridge Company has been

dissolved by the Legislature, and that, therefore, they have no rights to be protected in this or any other Court.

Two Acts were passed by the last Legislature in reference to this corporation.  One bears date the 28th of December, 1847, and directs His Excellency, the Governor, to cause judicial proceedings to bo instituted, in the Superior Court of the County of Randolph, for the purpose of forfeiting the charter granted to this Company in 1837.  The other is dated on the 29th of the same month, one day thereafter, and declares the Act of 1837, incorporating the Company, to be repealed, upon the ground that certain conditions were therein prescribed, upon compliance with which depended the privileges therein granted; that ten years had already elapsed, and that the terms of the charter had not been performed, to the great injury of James and Samuel Harrison, upon whose land the eastern abutment of said bridge rests.

With the first of these Acts, the Court at present have nothing to do.  It is merely directory in its character, and we are bound to suppose that the duty which it enjoins will be properly and legally discharged.

Is the Act of repeal valid and obligatory upon this Court?  To investigate the constitutionality of an Act of the co-ordinate branches of the Government, is always a delicate and painful duty.  But when the rights of individuals are concerned—rights recognized and secured by a judgment of the highest judicatory of the State, and the question is thus distinctly presented—we cannot falter.  Upon the faithful discharge of duty by the Judiciary depend, in no small degree, the integrity and duration of Government itself.

No Court in this Union has gone farther, I might in truth say, so far, as this tribunal, in maintaining the just constitutional rights of the law-making power.  *See Flint River Steamboat Company vs. Foster*, 5 *Georgia Reports*, 194.  If, however, it should be found that the law in question is not sustained by the Constitution, we are bound to pronounce it void.  For myself, I can declare, with the utmost sincerity, that the Acts of the last Legislature, beyond any since 1799, command my most cordial and unqualified admiration.  But the Act under consideration bears upon its face the evidence of haste and inconsideration.  After having directed the Governor to cause proceedings to be instituted, with a view to forfeit the charter, why the very next day at-

tempt to forestall these proceedings by declaring the charter already forfeited?

Again, the Act assumes that ten years have already elapsed, and that the conditions of the charter have not been complied with, and for this reason, the privileges which it confers are recalled. And it is stated in the argument, that this assumption is based upon the former judgment of this Court in this case. If so, I regret to say that the whole tenor of that decision was altogether misconceived. It is certainly true, that it admits the fact that the terms of the charter have not been complied with. But what terms? Not that the bridge has not been built, the only purpose for which the charter was granted. This has been done long since. Why, the very *gravamen* of the Bill now under review, is to restrain the Company, or their assignees, from opening the bridge for the public use. The failure is, that the owners of the land have not yet been paid for their property; and the record and judgment of this Court so far acquit the Company from censure on this score, that it was considered equitable and right to allow further time for this purpose. Had the case been fully understood, it would have been seen, that the Court was convinced that the Company had manifested the utmost good faith in their efforts to comply with the requisitions of their charter in this particular, and were prevented from doing so by the persevering refusal of the other party to come to any agreement, and a mistake, clerical or otherwise, to have the appraisers appointed by the proper Court, to assess the value of the land on which the eastern abutment of the bridge stands. The Justices of the Inferior Court, sitting as they frequently do, for *Ordinary* and *County* purposes, on the same day, the application was recorded on the minutes of the *former* instead of the *latter;* and the owners of the land, *not the Company*, taking advantage of this mistake, rejected the compensation which was assessed and tendered. And this is the failure referred to in our former judgment. And now it is said, that it was upon this that the Act of dissolution was predicated!

[6.] Had the Act of repeal proceeded upon the idea, that the charter of 1837 was improvidently granted, the assumption would have met my hearty approval, whether its constitutionality could have been sustained or not. A bridge was needed, I have no doubt, at the point designated. A ferry transports persons and

effects with more delay and less safety.  Public convenience, therefore, demanded this erection.  But the Legislature was under no obligation to grant this franchise to the Irwinton Bridge Company.  If made to any one, it should have been to the owners of the soil where the bridge was to be built.  In the exercise of the right of *eminent domain,* regard should always be had to the interest of the citizen; and whenever the public good requires that he should relinquish his property for the common use, a preference should be given to him over a stranger, and he should, if he would, reap the profits.  This would reconcile him to his loss or forced contribution to the convenience of the community.  A grant to another, therefore, without a necessity, is unjust to the proprietor of the freehold.  It should never be arbitrarily or capriciously done.  If the owner cannot, or will not receive the franchise, pay him for his property and grant it to another.  Usually he will gladly accept the privilege, for men are presumed to consult their interest.  If, by reason of poverty or other cause, he cannot use it himself, he can dispose of the franchise to others.  *I speak as a man;* if the charter of 1837 was conferred over the heads of the owners of the soil, or without notice to them, it was wrong, and their subsequent conduct is neither to be wondered at, nor stigmatized.  The yare entitled to sympathy rather than censure.  I would think it expedient to pass a general law, giving to the owners of land, over strangers, the preference in all such cases, so far as it was practicable.

But to the constitutional question.  The doctrine is thus stated by *Angell & Ames:*—"By the theory of the British Constitution, Parliament is omnipotent; and hence, an Act of that body would undoubtedly be effectual to the dissolution of a corporation.  It is to the honor of that nation, however, that this power, restrained by public opinion, rests mainly in theory; and, except in the instances of the suppression of the Order of Templars, in the time of Edward the Second, and of the religious houses in the time of Henry the Eighth, we know of no occasions on which Parliament have thought proper to dissolve, or confirm the arbitrary dissolution of corporate bodies.  When, in 1783, a bill was introduced for the purpose of remodelling the charter of the East India Company, it was opposed by Mr. Pitt and Lord Thurlow, not only as a dangerous violation of the charter of the Company, but as a total subversion of the Law and Constitution of the country.

In the nervous language of the latter, it was ' an atrocious viola-
tion of private property, *which cut every Englishman to the bone.*'
Corporate property and franchises, important as they usually are
in amount and extent, and undefended by the same strong sym-
pathies which guard individual rights, offer a more tempting and
easier spoil to misguided power, whether it resides in the Prince
or the people. It is a happy feature in the Constitution of our
own Government, that the power of the Legislatures of the dif-
ferent States resembles, in this particular, the prerogative of the
King of Great Britain, who may create, but cannot dissolve a
corporation, or, without its consent, alter or amend its charter.
In the tenth section of the first article of the Constitution, it is
declared—' No State shall enter into any treaty, alliance or con-
federation ; grant letters of marque or reprisal; coin money;
emit bills of credit ; make any thing but gold and silver coin a
tender in payment of debts; pass any bill of attainder, *ex post
facto* law, or *law impairing the obligations of contracts,* or grant
any title of nobility.' And in this clause it has been settled, that
the charter of private corporations, whether civil or eleemosynary,
is an executed contract between the Government and the corpo-
rators, and that the Legislature cannot *repeal,* impair or alter it,
against the consent, or without the default of the corporation,
*judicially ascertained and declared.*" *Angell and Ames on Corpo-
rations,* 502.

Chancellor *Kent* calls this a great principle of constitutional
law, settled in the case of *Dartmouth College vs. Woodward,* and
asserted and declared, by the Supreme Court of the United
States, in numerous other cases antecedent to that decision. 2
*Kent's Com.* 306. 4 *Wheat.* 518. 6 *Cranch,* 88. 7 *Ib.* 164. 9
*Ib.* 43. *Ib.* 292. 8 *Wheat.* 1. 2 *Mass.* 143. 1 *Paige's Ch. Rep.*
107. 7 *Conn. Rep.* 53.

[7.] Anciently, it was doubted whether a corporation could be
dissolved at all for a breach of trust. It is now well settled that
it may; but then it must be first called upon to answer. 12 *Mod.*
271. 5 *Johns. Ch. Rep.* 380. 2 *Term Rep.* 515. *Canal Company
vs. Rail Road Company,* 4 *Gill & Johnson,* 1. *Story J.* 9
*Cranch,* 51. *Lord Holt in London vs. Vanaire,* (12 *Modern,*) said :
" All privileges are granted on condition that they shall be duly
executed according to the grant, and if they neglect to perform
the terms, the charter may be repealed by *scire facias.*"

The forfeiture of corporate franchises, by non-user or mis-user, was fully discussed in the case of *The King vs. Army*, 2 *Term Rep.* 515; and it was held, that although a corporation may be dissolved, and its franchises lost by non-user or mis-user, yet it was assumed as an undeniable proposition, that the default was to be judicially determined *in a suit instituted for the purpose.*

*Mr. Justice Story*, in delivering the decision of the Supreme Court in *Terrell and others vs. Taylor and others*, (9 *Cranch*, 51,) says: "A private corporation, created by the Legislature, may lose its franchises by a mis-user or a non-user of them, and they may be resumed by the Government, *under a judicial judgment upon a quo warranto to ascertain and enforce the forfeiture.*"

The same doctrine underwent a most thorough examination in the *Canal Company vs. the Rail Road Company*, 4 *Gill and Johnson's Rep.* 1—the case occupying 273 pages. It was there ruled, among other things, that the charter of the Potomac Company was a contract between the States of Maryland and Virginia and that Company, the obligation of which could not, without the assent of the corporation, be impaired by any Act of the Legislatures of either of those States, nor by the concurrent Acts of both, consistently with that section of the Constitution of the United States which declares that "no State shall pass any law impairing the obligation of contracts;" that in ordinary cases, the State may repeal or modify, at pleasure, any act of incorporation granted by it, before it is accepted, *and when no rights have been acquired under it*; that, until accepted, it is not a grant, nor the public faith pledged not to impair it; that a corporation may forfeit its charter by non-user or mis-user of its franchises; but, say the Court, *it is well known, that such forfeiture can only be enforced at the instance of the Government, and that no cause of forfeiture can be taken advantage of, collaterally or incidentally*, and that the proceedings for breach of the conditions should be by *scire facias* or *quo warranto*.

The doctrine intimated in this opinion, that a charter granted without consideration, and before its execution, so as to create any rights or duties, which, in contemplation of law, may be impaired, may be repealed by a subsequent Legislature, has often been maintained by the Courts of this country. *Trustees of the Bishop's Fund vs. Rider*, 13 *Day's R.* 87. *Fletcher vs. Peck*, 6 *Cranch*, 87. *New Jersey vs. Wilson*, 7 *Cranch*, 164. *Terrell vs.*

*Taylor,* 9 *Ib.* 43. *Sturges vs. Crowningshield,* 4 *Wheat. R.* 122.
*Dartmouth College vs. Woodward,* 4 *Wheat. R.* 518. *Green vs.
Biddle,* 8 *Wheat. R.* 1. *Atwater vs. Woodbridge,* 6 *Conn. R.* 223.
*Osborne vs. Humphreys,* 7 *Conn. R.* 336. *The Derby Turnpike
Co. vs. Parks,* 10 *Conn. R.* 522. *London vs. Litchfield,* 11 *Ib.*
251. *The People vs. Platt,* 17 *John. R.* 195.

In *Slee vs. Bloom,* 5 *John. Ch. R.* 381, *Chancellor Kent* held
that the forfeiture of corporate rights must be judicially ascer-
tained and declared; and that corporate power which may have
been abused or abandoned, cannot be taken away *but by regular
process.* He considers all the cases with his usual scrutiny and
discrimination, and expresses a belief, that there is no instance of
calling in question the rights of a corporation, or body, for the
purpose of declaring its franchises forfeited and lost, *but at the
instance and in behalf of the Government.* It is true that this de-
cree was reversed in the Court of Errors, not, however, upon
the ground that the Chancellor's position, so far as it related to
the acts of non-user or mis-user, was incorrect. *Spencer, Ch. J.*
who gave the unanimous opinion of the Court, said—" upon the
authorities and for the reasons given by the Chancellor, mis-user
or non-user cannot be relied on as a substantive and specific ground
of dissolution." The reversal proceeded upon the fact, that the
corporation in question had surrendered their franchise.

[8.] It would seem to be wholly useless to multiply precedents—
there is no end to them. The doctrine at this day is well settled,
that a private corporation is a contract between the Government
and the corporators, and that the Legislature cannot repeal, im-
pair, or alter the rights and privileges conferred by the charter,
against the consent and without the default of the corporation,
judicially ascertained and declared, in a proceeding instituted
directly for that purpose, at the instance of the Government; and
that no advantage can be taken of any non-user or mis-user on
the part of a corporation, *by any defendant* in any collateral action.

For the reasons assigned, therefore, the judgment of the Cir-
cuit Court must be affirmed, and the cause remanded, with the
following instructions : It is the opinion of the Court—

1. That the complainants in the bill have shown no right, by
grant from the Legislature, or otherwise, to their ferry across the
Chattahoochee river ; and that, consequently, they have no pro-

perty therein, which would entitle them to enjoin the defendants, upon the ground of injury to or interference with said ferry.

2. That the Irwinton Bridge Company, or their assignee, had the right, under their charter, to enter on the land of the complainants, and make the necessary survey, and take all other preliminary steps for the purpose of locating the eastern abutment of their bridge, before compliance with the provisions of their charter; but that they have no authority to appropriate the private property of the complainants to their permanent and exclusive use, until adequate compensation is made or tendered in terms of their charter.

3. That the pleadings show, that the Company have built the bridge, and are in possession thereof, and that they have not yet complied with the requisitions of their charter; they are therefore trespassers upon the land on which the east end of the bridge stands, and the injunction restraining them from the use and enjoyment of said property must be retained.

4. That the record shows diligence on the part of the defendants, to comply with the conditions of their charter, and that farther time be allowed them for that purpose.

5. That *mandamus* is not the proper remedy to correct the errors of the Inferior Court; that the said Court, under the charter of 1837, are ministerial officers only; and that their decision upon the rights of Edward B. Young, for the appointment of commissioners to assess the value of complainant's land, is not conclusive, and the said Young is entitled to renew his application, and that a certified copy of this and the former judgment of this Court is conclusive evidence that he is entitled to have said appointment made.

6. That it is not competent for the Legislature to divest said assignee of the rights which he acquired by the judgment of this Court heretofore rendered.

7. That a receiver be appointed by the Chancellor below, who, after giving bond, with approved security, in a suitable sum, for the faithful performance of his duty, shall take possession of the bridge in controversy, complete the repairs thereto, and open the same for the public use; and that, after defraying the expenses of repairing and keeping in order said bridge, retaining just compensation, to be adjudged and allowed by the Chancellor, and every other necessary outlay, that he retain the balance of the toll

money in his hands, subject to the future order and decree of the Chancellor, as to the rightful ownership thereof.

8. That upon compliance by the Irwinton Bridge Company, or their assignees, with the provisions of their charter, that the cross injunctions now pending between the parties, be, by the Chancellor, both dissolved, and the bridge, with its appendages, be ordered to be delivered over to the defendants in the bill.